UNITED STATES of America

v.

Alfred ABBADESSA, Joseph Antonucci, Michael Antonucci, Juan Ayala, Anthony Barone, Salvatore Cariola, Benny Chao, Peter DePrima, Nicola DeRiggi, Brian Ficeto, Jai Gurdyal, Ismael Hernandez, Andrew Komonski, William Kruczowy, Lawrence Lazewski, Richard Litwinkowich, Edwin Mercado, St. Elmo Moaze, Gilbert O'Connor, Raymond Quinones, Joseph Ridley, George Rodriguez, Ralph Sands, Raphael Sargeant, John Sarcone and Anthony Tetro, Defendants.

UNITED STATES of America

v.

Victor SMITH, Defendant.

UNITED STATES of America

v.

Andrew FICHERA and Jacob Rockson, Defendants.

Nos. CR 92–925, CR 92–1231 and CR 93–1310.

United States District Court, E.D. New York.

April 26, 1994.

Zachary Carter, U.S. Atty., by Gordon Mehler, Brooklyn, for U.S.

Barry Teller, Forest Hills, NY, for defendant Alfred Abbadessa.

Ronald Rubinstein, Queens, NY, for defendant Joseph Antonucci.

Ronald Rubinstein, Queens, NY, for defendant Michael Antonucci.

Paul Rinaldo, Forest Hills, NY, for defendant Juan Ayala.

LaRossa, Mitchell & Ross by Michael Ross, New York City, for defendant Anthony Barone.

Salvatore Marinello, Mineola, NY, for defendant Salvatore Cariola.

Phillip Katowitz, New York City, for defendant Benny Chao.

Alfred DeGrazia, Brooklyn, NY, for defendant Peter DePrima.

Murray Richman, Bronx, NY, for defendant Nicola DeRiggi.

Alan Hirschman, Brooklyn, NY, for defendant Brian Ficeto.

Paul Goldberger, New York City, for defendant Andrew Fichera.

Daniel Noble, New York City, for defendant Ismael Hernandez.

Michael Bachner, New York City, for defendant Jai Gurdyal.

Harold Borg, Kew Gardens, NY, for defendant Andrew Komonski.

Joel Walter, Brooklyn, NY, for defendant William Kruczowy.

Steven Siegal, Oceanside, NY, for defendant Lawrence Lazewski.

Kenneth Paul, New York City, for defendant Richard Litwinkowich.

Thomas White, New York City, for defendant Edwin Mercado.

Bernard Udell, Brooklyn, NY, for defendant St. Elmo Moaze.

Maurice Sercarz, New York City, for defendant Henry Muller.

Jerry L. Tritz, New York City, for defendant Gilbert O'Connor.

John Burke, Brooklyn, NY, for defendant Raymond Quinones.

Maria DelGaizo Noto, Matawan, NY, for defendant Joseph Ridley.

Neil B. Checkman, New York City, for defendant Jacob Rockson.

Richard E. Kwasnik, New York City, for defendant George Rodriguez.

James Neville, New York City, for defendant Ralph Sands.

Joseph Sorrentino, Staten Island, NY, for defendant John Sarcone.

Roger Archibald, Brooklyn, NY, for defendant Raphael Sargeant.

Joel Stein, New York City, for defendant Victor Smith.

Lloyd Epstein, New York City, for defendant Anthony Tetro.

### SENTENCING MEMORANDUM

WEINSTEIN, Senior District Judge:

Defendants are thirty New York City Taxi and Limousine Commission ("Commission") inspectors who have pled guilty to extortion. They accepted bribes in exchange for overlooking defects and for certifying inspections for taxicabs that were never inspected. Some of the defendants were line inspectors who conducted the fraudulent inspections, others were senior inspectors who condoned the corruption, and yet others were supervisors who furthered the scheme by manipulating work schedules to ensure that the corrupt line inspectors were on the same inspection team. All shared in the profits.

Sentencing here involves a key objective: corruption in government agencies charged with protecting public safety must be deterred by loss of liberty to the offender. In imposing punishment the court must nevertheless consider the fact that the endemic extortion was due in large measure to incompetence of high officials in the city government, that some of the inspectors were drawn unwillingly into this cesspool of corruption and that some cooperated fully in exposing the dirty details.

### I. FACTS

All defendants have pled guilty to conspiracy to commit extortion by accepting illegal payoffs. Section 1951(a) of Title 18, the federal extortion statute, provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be [guilty of a felony.]

18 U.S.C. § 1951(a). The maximum penalty for a violation of section 1951 is twenty years imprisonment, id., and a fine of $250,000. 18 U.S.C. § 3571(b)(3).

The Commission was created in 1971 to improve taxi and limousine service in New York City. It is responsible for establishing standards for taxicab safety and air pollution. Its regulations require that taxicabs be inspected to ensure structural and mechanical safety and appropriate exhaust emission levels. Since 1989 all safety and emissions inspections have taken place at the Safety and Emissions Division in Woodside, Queens. An estimated 200 taxicabs are inspected at that site each day. All the inspectors worked at the Woodside facility.

Taxicabs must be inspected three times a year. Additionally, field inspectors may issue "notices of violation" to taxicabs in the street that do not conform with Commission regulations. Failure to pass inspection or to correct a violation promptly can result in the suspension of the right to operate the taxicab until the defect is repaired, resulting in a

significant loss of revenue to the owner and operator.

At the time most of these inspectors were arrested, the top position in the Safety and Emissions Division was vacant. The division was run by the Assistant Commissioner for Safety and Emissions and the Deputy Director of the Safety and Emissions Division; neither of them has been prosecuted criminally. Immediately below them were defendant chief supervising inspector Nicola DeRiggi and defendants supervising inspectors Andrew Komonski and Anthony Barone. All three received bribes and participated in the extortion conspiracy. Seven senior inspectors reported to the supervising inspectors. Three of those senior inspectors participated in the payoff scheme and are defendants. Forty-four line inspectors were employed. Twenty-four of them are defendants.

Inspection lanes are equipped with computerized testing equipment. There are six inspectors on each lane. Inspectors who were receiving illegal payoffs generally worked together on one lane. The roles played by supervising inspectors DeRiggi, Komonski and Barone were critical to the success of the corruption scheme because they were responsible for assigning personnel to the various inspection lanes. Corrupt inspectors were grouped together and assigned to particular positions to facilitate the scheme. The senior inspectors were also essential to the success of the plan because they were present during the performance of the inspections, had immediate supervisory responsibility for the line inspectors and acted as conduits for payoffs to the supervising inspectors.

Methods of evading or disabling the inspection tests were devised. The inspector in position 1 was responsible for inspecting the credentials and other paperwork for the taxicab; this position offered little opportunity for illegal manipulation. The inspector in position 2 was responsible for checking the emission system of the taxicab; in order to get a false passing result, the inspector would run the taxicab for an excessive period of time before measuring the emission, or would manipulate the way the measuring probe was placed in the tailpipe. The inspec-

tor in position 3 was responsible for wheel alignment; the inspector would run the rear wheels over the test plate twice instead of running both the front and rear wheels over the plate so that the taxicab would appear to be properly aligned. The inspector at position 4 was responsible for testing headlights; the inspector would manipulate the testing apparatus until the computer registered a passing mark. The inspector at position 5 was responsible for testing brakes; the inspector would test the rear brakes twice instead of testing the front brakes which were usually in worse condition. The inspector in position 6 was responsible for visually inspecting the undercarriage of the taxicab; the inspector would ignore defects.

One inspector on a corrupt lane would serve as the "treasurer" or "banker" of the day, responsible for collecting and disbursing the payoffs. Money was divided among the six line inspectors and inspectors who directed the taxicabs to the corrupt lane.

The scheme also involved inspections designed to verify that defects cited by field inspectors had been corrected. Compliance was checked in a special lane with four inspectors. If a taxicab passed, a "condition corrected receipt" was issued. Corrupt inspectors received payoffs in exchange for issuing for receipts for taxicabs that had not been repaired and for some that had not even been brought into the Woodside facilities, referred to as "phantoms" by defendants.

There was a schedule of bribes. It costs between $50 and $100 to pass a routine inspection. Overlooking notices of violation cost less, about $20 per notice. Often, however, the field inspectors would find several things wrong with one taxicab and would issue multiple notices of violation resulting in bribes of $100 or more.

Payments were made in many ways. Cash was left in ashtrays, behind visors, between car seats, in packages of cigarettes and passed through a nearby coffee stop.

The government cannot specify with certainty the total amount the corrupt inspectors received. Its conservative estimate is $208,000. That figure was calculated by av-

eraging the inspectors' estimates of their weekly payoffs on a "low" week. The average was divided by five to reach a payoff per day; using time and attendance records, that figure was multiplied by the number of days each inspector was assigned to an inspection line where payoffs were received. The government calculates that the average inspector received about $250 a week in bribes, although some admitted that they received more than $600 each week. Inspectors also received non-cash bribes such as auto parts, narcotics and illegal guns.

In December of 1990, the New York City Department of Investigation ("DOI") was notified by a Commission employee that taxicabs were receiving passing certifications without inspections taking place. Two months later DOI received information from a former inspector that employees were soliciting bribes in exchange for overlooking defects. The DOI's investigation lasted more than a year. It included a covert operation with the cooperation of active inspectors.

As a result of the DOI investigation and the prosecution of these defendants, Mayor Dinkins appointed an Advisory Panel to review the procedures of the Safety and Emissions Division of the Commission. The panel's report included a number of recommendations such as changes in hiring, promotion and termination procedures and enhanced training. Computerized testing has been modified to inhibit manipulation. Taxi drivers are no longer allowed in the inspection lanes. Inspection reports are now routinely reviewed by Commission officials for indications of abuse. There are random double checks of inspections. Staffing rotations are systematic. The Commission contends that it has been cooperating with DOI in identifying and correcting additional corruption hazards. *See, e.g., Procedural Review of the Taxi and Limousine Commission Centralized Inspection Facility,* July 1993; Letter from Paul E. Krazanoff, Assistant Corporation Counsel to court, March 22, 1994; Letter from Fidel F. Del Valle, Chairman of Commission, to court dated March 25, 1994.

There is strong evidence that taking cocaine was widespread and, as one defendant put it, "normal" among inspectors. This sug-gests the need for considering required testing for drugs in the future. *Cf. Matter of Gary Delaraba v. Nassau County Police Department,* 83 N.Y.2d 367, 610 N.Y.S.2d 928, 632 N.E.2d 1251 (1994); *Patchogue–Medford Congress of Teachers v. Board of Education of Patchogue–Medford Union Free School District,* 70 N.Y.2d 57, 70, 517 N.Y.S.2d 456, 462, 510 N.E.2d 325, 331 (1987).

Unless city officials take corruption more seriously it is doubtful that these current changes will keep this operation clean except in the short run. Experience in this court with corruption demonstrates that the general deterrent effect of criminal sanctions is usually short-lived.

## II. *PUNISHMENT*

### A. *The Sentencing Statutes*

Under the Sentencing Reform Act of 1984, sentencing is generally governed by three related statutory provisions. Section 3551 of Title 18 mandates that the court impose sentences to achieve a number of purposes listed in section 3553(a) in light of the particular case:

Authorized sentences.

(a) In general.—Except as otherwise specifically provided, a defendant who has been found guilty of an offense described in any Federal statute ... shall be sentenced in accordance with the provisions of this chapter so as *to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2)* to the extent that they are applicable *in light of all the circumstances of the case.*

18 U.S.C. § 3551 (emphasis added).

Section 3553(a) specifies the manifold purposes of sentencing, including promoting respect for the law, achieving just punishment and general deterrence, protecting the public against recidivism and providing the defendant with rehabilitation and treatment. The section enumerates seven factors that a court must weigh when sentencing. A key provision embodies the concept of "parsimony," a principle of the American Bar Association standards for criminal justice. *See*

American Bar Association, *Standards For Criminal Justice,* Chapter 18, "Sentencing Alternatives and Procedures", 18–3.2(iii) ("Parsimony in the use of punishment is favored. The sentence imposed should therefore be the least severe sanction necessary to achieve the purposes for which it is imposed . . .") (1993). *See also* Richard S. Frase, *Sentencing Guidelines in the States: Lessons for State and Federal Reformers,* 6 Federal Sentencing Reporter 123, 124 (1993). This principle, when applied to interpretation of criminal statutes, is known as lenity. "The Court will not interpret a federal criminal statute so as to increase the penalty . . . when such an interpretation can be based on no more than a guess as to what Congress intended." *United States v. Granderson,* —— U.S. ——, ——, 114 S.Ct. 1259, ——, 127 L.Ed.2d 611 (1994) quoting *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) quoting *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958) (inner quotation marks omitted). In the context of sentencing it requires that, to the extent practicable, the sentence be neither more nor less harsh than required to achieve the sentencing objectives appropriate for the particular case. This rule of appropriateness is incorporated explicitly in the statute as follows:

Imposition of a Sentence.
(a) Factors to be considered in imposing a sentence.—The court shall impose *a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)* of this subsection. The court, in determining the particular sentence to be imposed, shall consider [the factors set out in (1) and (2) quoted below.]

18 U.S.C. § 3553(a) (emphasis added).

■ Each case and each defendant must be considered in light of special circumstances and characteristics of the defendant and of the offense:

(1) the nature and *the circumstances of the offense and the history and characteristics of the defendant* [must be considered]. . . .

*Id.* (emphasis added). As already noted, the sentencing goals as specified in section 3553(a)(2) are "applicable in light of all the circumstances in the case." 18 U.S.C. § 3551(a). Repetition in section 3551(a) and 3553(a)(1) of the primacy of "circumstances" of the particular case stresses the importance of individualized sentencing.

■ Sentencing goals include general and specific deterrence, rehabilitation, restitution, and uniformity. The provision requires that the Sentencing Guidelines be considered as *one—but only one—of the factors* in carrying out the statutory goals. The court must take account of:

(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the [sentencing] guidelines . . .;
(5) any pertinent policy statement issued by the Sentencing Commission . . .;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

*Id.*

Section 3553(b) of Title 18, which must be construed with the rest of section 3553, provides further direction with respect to the use of the Sentencing Guidelines. It states in relevant part:

The court shall impose a sentence of the kind, and within the range, referred to [by the Guidelines] unless the court finds that there exists aggravating or mitigating circumstances of the kind, or to the degree,

not adequately taken into consideration by the Sentencing Commission. . . .

18 U.S.C. § 3553(b). Read alone, this provision would appear to give ruling weight to the Guidelines, but, as already pointed out, such an interpretation would ignore the thrust and design of related provisions.

An analysis of how a sentencing court should apply the three provisions quoted is detailed in *United States v. Concepcion,* 795 F.Supp. 1262, 1275–81 (E.D.N.Y.1992). It concludes:

> As a first step, under sections 3551 and 3553(a), the court must consider how, given the circumstances of the case, the various purposes of sentencing can best be served. It is aided in this inquiry by considering whether any or all of the seven factors listed in section 3553(a) are applicable and what their relative weight should be.
>
> As part of this first-step inquiry, courts must determine whether the Sentencing Commission's Guidelines and Policy Statements ought to control a given case to the exclusion of all other factors. In this regard, courts will tend to rely on the Guidelines where the case is typical of many like situations and is susceptible to the statistical analysis and compilation techniques used by the Commission in developing the Guidelines. *See* United States Sentencing Commission, *Guidelines Manual* 5 (Nov. 1991) ("The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes."). The experience of trial judges in determining whether a case is run-of-the-mill or presents unusual problems or local variations necessarily will inform this decision.
>
> If the conclusion of the first-step analysis is that the Guidelines and Commission Policy Statements ought to apply to the exclusion of other factors, the court proceeds to the second step, which is to follow the directive of section 3553(b) and apply the Guidelines and Policy Statements according to their terms. In this endeavor the court will look to the published work of the Commission, seeking to construe the terms of the [applicable] *Guidelines Man-*

*ual* to determine the appropriate Guidelines sentencing range.

> The court's third step is to consider (a) the sentencing options provided, if any— e.g., imprisonment or probation—and (b) whether any exceptions recognized by statute or the Guidelines themselves apply— e.g., not adequately considered aggravating or mitigating factors.
>
> Even in a case where the court must sentence under step one because the Guidelines do not control, it will be desirable in many instances to go through steps two and three so that the court can reconsider its step one conclusion by checking it against the national averages in the closest analogous cases.

*Id.* at 1279.

### B. *Applying the Analysis Required By the Statutes*

#### 1. *The Goals of Sentencing In This Case*

■ The primary goal of sentencing in this case is to deter future corruption of the staff of the Commission and other government agencies that have responsibilities to the public to enforce safety standards. There is also a need in this case to avoid unnecessary sentence disparities except on some principled ground because many of the defendants played similar roles in the scheme and have similar backgrounds. Levels of responsibility for control of the inspection lines, differences in backgrounds of defendants, degrees of participation in the fraudulent scheme and cooperation with investigators must also be considered.

The Guidelines are of marginal utility in the instant case, although they are of some use as indicators of how other courts have treated other cases of fraud. *See Concepcion,* 795 F.Supp. at 1271. The Guideline ranges are based primarily on statistical averages of sentences imposed in the past. The national experience with individual cases of many types of fraud is not particularly helpful in assessing the appropriate sentences for the participants in 1) a corruption scheme that took place in a municipal setting where corruption was endemic and was allowed to continue unchecked by municipal

officials and 2) the prison terms required by the Guidelines would be unnecessarily destructive of defendants, their families and their communities.

The court has thoroughly explored the factual background of the crimes and of each defendant. It has carefully observed each defendant in court on repeated occasions in the company of friends, relatives, children and attorneys, and has questioned each in detail about his role in the scheme and his background. Each of the factors set out in section 3553 has been separately considered in arriving at each defendant's sentence. The sentences imposed under the particular circumstances of this case have required particular emphasis on the factors set forth in section 3553(a)(1), the nature and circumstances of the offense; section 3553(a)(2)(A), the need for the sentence to reflect the seriousness of the offense and to promote respect for the law; section 3553(a)(2)(B), the need for the sentence to afford adequate deterrence to criminal conduct; and section 3553(a)(6), the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### 2. The Sentencing Guidelines

Even though the Guidelines are not binding in this case, the court finds it instructive to consider the Guideline ranges along with the other pertinent statutory factors. The Guidelines suggest terms of imprisonment, probation with terms and conditions, supervised release, fines, restitution and payment of costs of imprisonment or probation.

The Guideline applicable to the offense in this case is section 2E1.5 which in turn refers to section 2C1.1. That Guideline sets a base offense level of 10, Section 2C1.1(a), and requires that additional points be added if the value of the payments received, the benefit received in return for the payment or the loss to the government exceeds $2,000. Section 2C1.1(b). The higher the dollar value of the fraud, the higher the offense level. The offense level and the defendant's criminal history essentially determine the recommended sentence. Section 5E1.1 provides for the restitution of ill-gotten gains and

section 5E1.2 contains a table for the imposition of fines corresponding to offense level.

The Guideline recommendation as calculated by the United States Probation Department for each defendant is considered in Part III(B) of this opinion. Those calculations assume that each defendant is responsible for the entire $208,000 gained from the fraudulent scheme. If the Guidelines as written and interpreted by probation and the government were applied to these defendants by the court, the defendants who were not in positions of authority and who played the most minor role in the scheme would be held responsible for the total amount of money received by all conspirators, not the small amounts they personally received in bribes. Since a number of the minor defendants received no 5K1.1 letter—even though they sincerely tried to cooperate—and the most culpable received such a letter—being in a position to know and reveal details of the entire scheme—the least culpable would end up with the highest prison terms. It is significant that the United States Attorney objected only to the leniency afforded the least culpable on the ground that this was the required Guideline result. This patently absurd result could not have been the Congressional plan even though, arguably, it is what the Guidelines require.

### 3. Departures From the Guidelines

Even in cases where the Guidelines are the primary consideration, courts may depart upward or downward from the Guidelines recommendation. Section 5K1.1 provides that the court may depart from the Guidelines upon a motion from the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person. The court may also depart from the Guidelines as provided in 18 U.S.C. § 3553(b), if the court finds that aggravating or mitigating factors exist that were not adequately taken into account in the fashioning of the Guidelines. The court's freedom to depart from the Guidelines is limited by Guideline section 5H1 which lists factors that a court should not consider as bases for departing.

In each instance where a departure is not authorized by a 5K1.1 letter a downward

departure is warranted in the instant case by the special circumstances of the crime and the defendant that were not adequately considered by the Sentencing Commission. Thus, even were the Guidelines decisive here—which they are not—the sentences imposed would be appropriate.

#### 4. *Restitution*

■ The City of New York and the Commission has asked that, as part of their sentences, the defendants be ordered to pay back the salaries they earned while they participated in the corrupt scheme. They argue that the City was grievously harmed by the conspiracy because the City's efforts to improve traffic safety and air quality were thwarted by the corrupt inspectors and that the defendants accepted wages for work not performed. They also argue that the corruption undermined the public's trust in its government. Restitution is required, but to a lesser extent than the City requests.

### III. *INDIVIDUAL SENTENCES*

#### A. *In General*

The court heard from each of the defendants, their attorneys and in many cases additional witnesses. Each defendant was sworn and testified about his background and his role in the scheme.

The defendants, all male, are working class people, most of whom support wives and children. They were all released on bail after their arrests, and although they lost their inspection jobs as a result of this prosecution, most have found other work. Many have participated in community activities such as the boy scouts or church affairs. They have received high school diplomas, some went on to college and most had additional technical training and are skilled mechanics.

Some of the defendants were organizers and instigators of the corruption. These defendants, who cultivated contacts in the taxicab industry and recruited other inspectors—or even coerced them—to join the scheme, are more culpable than some others who, though not free from blame, may be characterized as followers.

The testimony of the defendants at the allocution described an occupation in which corruption was pervasive. One worker's corruption fed another's. Several defendants testified that they were intimidated and threatened by fellow workers when they showed resistance to the scheme—tires were slashed, cars were scratched and physical violence was threatened. One inspector testified that he reported the corruption to a supervisor, only to find out that the supervisor was part of the conspiracy. Because of their positions, the supervisors and senior inspectors bore a special responsibility to the public and to the City to put an end to the corruption.

Here, as in the welfare fraud cases detailed in *Concepcion, supra,* a large portion of the blame lies with the public officials who should have prevented the corruption. Poor management by the Commission was said to be well known in New York City. *See, e.g.,* Emily Sachar, *Big Yellow Taxi Troubles, No Brakes On: Too Few Inspect Yellow Fleets,* New York Newsday, Sunday, March 13, 1994 at 6. It should have been obvious to city officials years ago that the inspection system was rotten to its core, jeopardizing the public. Yet none of the officials were prosecuted criminally. Nor were any of the taxicab companies or their representatives charged with their crimes, though their guilt is clear. The court has no control over whom the United States prosecutes.

All the defendants must receive a sentence that includes some form of loss of liberty in order to deter corruption in governmental agencies charged with protecting public health and safety. Each defendant will be required to pay restitution in the amount that he received in illegal payoffs. Fines are also appropriate. The City's suggestion that the defendants pay back their salary for the time they participated in the scheme is not adopted since city officials allowed the corruption to continue and some useful services were rendered. Payment of ill-gotten gains through restitution to the city provides the equivalent payback in the form of fiduciary surcharges.

The government has rated the defendants on a scale from one to five, in its view five

being the most culpable and one the least. The ratings reflect the government's assessment of where the defendants fit in the overall corruption scheme based on their 1) position in the hierarchy, 2) depth of involvement, 3) length of involvement, 4) degree of aggressiveness in soliciting bribes, and 5) aggravating and mitigating factors. *See* Letter from Gordon Mehler, Esq., Assistant United States Attorney, to court, January 7, 1994.

The position of the defendant in the inspector hierarchy is a critical factor in determining an appropriate sentence. The supervisors and senior inspectors had special responsibilities as a result of their positions of authority. They held positions of public trust that created a duty to block corrupt schemes such as this one that threatened public safety. The supervisors and senior inspectors not only condoned the corruption, they encouraged and participated in it. They used their authority to further the scheme and to prevent it from being detected by other government officials.

The chief supervising inspector will receive thirty-six months of imprisonment; he would have received the maximum sentence had he not cooperated with the government. The two supervising inspectors will receive 24 and 30 months imprisonment. The three senior inspectors will receive 18, 15 and 13 months imprisonment. The line inspectors will receive between 6 and 12 months imprisonment with the exception of one defendant with a prior criminal record who will receive 15 months imprisonment, and several defendants who played extremely minor roles who will be incarcerated in a community treatment facility or in home confinement.

■ In the main, the persons who will feel the most pain from the sentences are not the defendants, but the defendants' families. The effect on the children, spouses and others cannot be ignored. A parent's role in supervising children and in providing support is particularly important in these times when uncontrolled children of broken families burden our courts and social institutions and add to welfare rolls. Courts cannot ignore the fact that close to 50% of children in this city are born out of wedlock and most lack paternal guidance. *See Single Parent Crisis:*

*'Disappearing Dads'*, New York Post, April 20, 1994, at 27 (45.7% as of 1991). *See also 4 Million Children Said To Live in 'Distress'*, New York Times, April 25, 1994, at B10 ("Nearly four million American children are growing up in neighborhoods with high rates of poverty, absent fathers, unemployment and reliance on welfare;" large proportion in New York State.) The court should avoid being party to further breakdown of stable two-parent families unless long imprisonment is unavoidable. Factors that affect a community in which a judge sits must be considered by the sentencing judge.

What is particularly striking about these defendants is that they were among the best of our skilled and reliable working people. Many letters to the court attest to the facts that they came from stable backgrounds and have led useful lives. Most of the defendants live in working class, often minority neighborhoods. The effect of the sentences on their communities must be considered.

Large numbers of the men in the defendants' communities are currently incarcerated. These defendants have educated themselves and worked hard throughout their lives. Their presence in the community helps create a more stable environment and a model of the work ethic that is vital to the health of New York's neighborhoods. Excessively long terms of incarceration for these defendants would have a detrimental local effect.

### B. *Individual Sentences*

#### 1. *Nicola DeRiggi*

■ Nicola DeRiggi is twenty-eight years old. He is single and has no children. He lives with his mother, a librarian for the Brooklyn Public Library, and his youngest sister, who is a student at Brooklyn College. He was chief supervising inspector while he participated in the corrupt scheme. He took illegal payoffs over an 18 month period beginning in February 1991 and could be charged with all payoffs to those under his supervision—$208,000. As chief inspector he had a greater opportunity than the other inspectors to influence the course of the conspiracy. He manipulated the assignments of corrupt inspectors to maximize the amount of

bribes that were paid to him and other inspectors. He also received an illegal handgun from a taxi fleet manager in lieu of a cash bribe.

Defendant and his two sisters were reared by both parents in a middle income family. His father held two jobs, as a custodian at the Brooklyn Public Library and as an independent contractor. His mother stayed at home. Defendant graduated from New Utrecht High School in Brooklyn in 1982. He attended the College of Staten Island for one semester and earned fourteen credits. Defendant is a skilled auto mechanic. He has been working with cars from the age of ten, and completed a work-study program in mechanics while in high school.

Work for the Commission by defendant began in August 1984 as an inspector. After eight months he was promoted to senior inspector. After another four and one half years he was promoted to chief supervising inspector. He held that position from September 1990 to July 1992 when he resigned as a result of this prosecution. He is currently employed as a chief mechanic in a gas station.

The relevant Guidelines call for 37 to 46 months in prison, two to three years of supervised release, a fine of $7,500 to $75,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government on a scale of one to five puts his culpability at five.

Nicola DeRiggi is sentenced to 36 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City of $10,000, a fine of $7,500 and a special assessment of $50.

### 2. *Andrew Komonski*

■ Andrew Komonski is thirty years old and lives with his wife, a clerical worker at the Department of Transportation, and his two and one half year old daughter. His father, who is an unemployed machinist, his brother, and his brother's wife live next door. Mr. Komonski was a supervising inspector while he participated in the corrupt scheme. He took a total of $3,650 in illegal payoffs over a nineteen month period beginning in

January 1991. He actively solicited bribes from the taxi industry and aggressively pursued line inspectors for a portion of the bribes. In addition, on several occasions he received cocaine in lieu of a cash payoff. He also participated in the sale of illegal guns with some of his co-workers.

Defendant and his brother were raised in Brooklyn, New York by both his parents in a middle-income home. His mother died in 1989 after suffering a stroke. Defendant graduated from Automotive High School in Brooklyn in June of 1981. He attended the New York City Technical College for two semesters and earned ten credits. He also attended the State University of New York at Farmingdale but received no credits.

From June 1983 to September 1984, defendant was employed as a mechanic at an auto shop in Jackson Heights, New York. From October 1984 to November 1985, he worked as a mechanic for an air conditioning company in Great Neck. He began working for the Commission in November 1985 as an inspector. In June 1986 he was promoted to senior inspector. In August 1989 he was promoted to supervising inspector and he held that position until he resigned in October 1992 as a result of this prosecution. Since that time Mr. Komonski has been working as an auto-diesel mechanic for an airline contractor.

The relevant Guidelines call for 33 to 41 months in prison, two to three years of supervised release, a fine of $7,500 to $75,000, restitution and a $50 special assessment. In view of his substantial assistance to the government, it has suggested a downward departure. It places his culpability at five.

Because of the aggravating circumstances of the illegal gun transaction and taking cocaine as a payoff, Andrew Komonski is sentenced to 30 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $3,650, a fine of $7,500 and a special assessment of $50.

### 3. *Anthony Barone*

■ Anthony Barone is twenty-nine years old and lives with his wife, a school teacher, and his newborn daughter. He was a super-

vising inspector while he participated in the corrupt scheme. He took a total of $3,000 in illegal payoffs over a sixteen month period beginning in April 1991. He did not actively solicit payoffs, but he allowed the corruption to flourish under his supervision and he accepted bribes. He also obtained an illegal gun from a taxi fleet manager at the direction of his boss, defendant DeRiggi.

Defendant was the youngest of four children raised by middle-class parents in Brooklyn, New York. He graduated from Bishop Ford Central Catholic High School in Brooklyn in 1982. After working for a year he attended Brooklyn College for four semesters. He attended Kingsborough Community College part-time for three years until he was arrested on this offense.

Employment of defendant by the Commission began in 1986 as an inspector. After fourteen months, he was promoted to senior inspector. In June of 1988 he was promoted to supervising inspector and he held that position until he was discharged as a result of this prosecution. Mr. Barone is presently working as an apprentice carpenter.

The relevant Guidelines call for 33 to 41 months in prison, two to three years of supervised release, a fine of $7,500 to $75,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government has categorized his culpability at four.

Anthony Barone is sentenced to 24 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $3000, a fine of $7,500 and a special assessment of $50.

#### 4. Jai Gurdyal

██ Jai Gurdyal is thirty-nine years old. He is married and has three children who reside with his wife in Florida. Defendant lives in a one-bedroom apartment in New York with his parents and two siblings. He was a senior inspector while he participated in the corrupt scheme. He took $12,560 in illegal payoffs over a twenty month period beginning in December 1990. On several occasions he received cocaine in lieu of cash.

Defendant also actively directed taxicabs desiring preferential treatment to corrupt line inspectors.

Defendant was born in Guyana into a family that was financially stable. When he was ten years old he was sent to Ontario, Canada to live with his aunt. He graduated from the Institute of Technical Trades in Ontario in 1975. In 1975, defendant immigrated to the United States to live with his uncle. The rest of his family joined him here nine years ago. The defendant became a naturalized citizen in 1983. In 1988, the defendant purchased a house for his family in Hollywood, Florida. He sent them there so they could have a better lifestyle. He remained in New York to work.

The Fashion Institute of Technology was where defendant studied from 1982 to 1983. He completed a 625 hour course in General Auto Mechanics at the Apex Technical School in New York City in 1983. In the early 1980's defendant was employed by various auto body shops as a mechanic.

After work as a line inspector, in June 1988 he was promoted to senior inspector. He held that position until October 1992 when he resigned pursuant to his plea agreement.

The relevant Guidelines call for 30 to 37 months in prison, two to three years of supervised release, a fine of $6,000 to $60,000, restitution and a $50 special assessment. As a result of his substantial assistance to the government, it has suggested a downward departure. The government put him in culpability category four.

Because he took cocaine as a payoff, and because of his substantial role in the scheme, Jai Gurdyal is sentenced to 18 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $12,560, a fine of $6,000 and a special assessment of $50.

#### 5. Benny Chao

██ Benny Chao is forty-five years old. He lives with his wife, two daughters, ages fifteen and thirteen, a four-year-old son and his seventy-seven-year-old mother. The defendant is unemployed and is his ailing moth-

er's primary caretaker. His wife works in a garment factory. Mr. Chao was a senior inspector while he participated in the corrupt scheme. He took $9,250 in illegal payoffs over a ten month period beginning in October 1991. He was not as active a participant as the other senior inspectors. He rarely directed taxis to corrupt lanes and he never failed taxis to coerce bribes. He did manipulate staffing to group corrupt inspectors on the same lane. He also oversaw payments to his supervisors.

Defendant was born in Hong Kong in 1948. He graduated from the Far East High School in Hong Kong in 1967. He left Hong Kong that year to attend the Airwork Service Training College in Perth, Scotland. In 1970 he entered the United States on a student visa. In June 1974 he earned an Associate Degree from the Academy of Aeronautics in New York City. From 1976 to 1983 the defendant was the operations manager of a restaurant. He became a naturalized citizen in 1982.

Work as an inspector began in 1985. He was promoted to senior inspector and held that position during the time of the conspiracy.

The relevant Guidelines call for 30 to 37 months in prison, two to three years of supervised release, a fine of $6,000 to $60,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as category three.

Benny Chao is sentenced to 15 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $9,250, a fine of $6,000 and a special assessment of $50.

### 6. *William Kruczowy*

■ William Kruczowy is forty-three years old. He lives with his wife and two children, ages seventeen and two years old. Defendant was a line inspector during his participation in the fraudulent scheme. He took $10,500 in illegal payoffs over a period of twelve months. There is no evidence that the defendant intentionally failed taxis or

directly received payoffs from the taxi industry representatives. Although he has admitted to a past cocaine problem, there is no evidence that he received cocaine as a payoff or that he used drugs while on the job.

Defendant was born in New York City. He had three siblings. His father, now deceased, was an insurance salesman. His mother was a homemaker. Defendant's sister and surviving brother reside in Queens, New York. Defendant married his present wife in 1972. She is a homemaker. Their family lives in Queens.

Defendant graduated from Newtown High School in Queens in 1969. He worked for thirteen years for a company that manufactured watch cases, first as a general helper and later as a floor foreman supervising manufacturing lines. He began working for the Commission in 1989 as an assistant stock handler. He was promoted to an inspector's position in September 1990. He was terminated as a result of this case in July of 1992.

Mr. Kruczowy has two prior convictions, putting him in a criminal history category of II. The relevant Guidelines call for 27 to 33 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government categorizes his culpability as level two.

William Kruczowy is sentenced to 15 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $10,500, a fine of $5,000 and a special assessment of $50.

### 7. *Victor Smith*

■ Victor Smith is thirty-four years old. He is single and the father of a thirteen-year-old girl for whom he provides child support and whom he visits regularly. Defendant was a senior inspector during the time of his participation in the corrupt scheme. He took $16,650 in illegal payoffs over an eighteen month period. He dealt directly with taxi industry representatives, passed taxis that were never inspected and he intentionally failed taxicabs in order to receive

additional bribes. He supervised a lane of five line inspectors who participated in the payoff scheme and he directed bribes to his supervisors. He also received drugs from taxi industry representatives as bribes in lieu of cash. Defendant participated in an earlier DOI investigation of corruption in the Commission. He wore a wire in that investigation in order to help obtain evidence, but the investigation was not productive. Despite his earlier cooperation and knowledge of the investigation, he continued to take bribes.

The defendant was born in Queens and raised in various parts of New York City. His parents were divorced when he was quite young, and throughout his childhood he was physically abused by a number of caretakers including his father, his grandparents and his stepfather.

A child was born to defendant out of wedlock. He supports the child without court order. He has used marijuana and cocaine in the past. He appears to be depressed and has shown high levels of carbon dioxide in his blood as a result of his work.

Mr. Smith attended William Bryant High School in Woodside, New York through the eleventh grade. He received his general equivalency diploma while attending the College of Human Services in New York City where he earned twenty-four credits. The defendant has completed occupational training in automotive mechanic skills and has completed the General Motors Apprentice Program.

From 1985 to 1987 defendant worked as an auto mechanic at an automotive store in Queens. He was employed by the Commission as a taxi inspector from March 12, 1984 to December 10, 1992, at first as a line inspector and later as a senior inspector.

The relevant Guidelines call for 30 to 37 months in prison, two to three years of supervised release, a fine of $6,000 to $60,000, restitution and a $50 special assessment. As a result of his substantial assistance to the government, it has suggested a downward departure. The government assessed his culpability as category four.

Victor Smith is sentenced to 13 months in prison followed by two years of supervised release. He should receive drug and psychological treatment in prison. He is ordered to pay restitution to the City in the amount of the bribes he received, $16,650, a fine of $6,000 and a special assessment of $50.

### 8. *Alfred Abbadessa*

Alfred Abbadessa is thirty-nine years old. He lives with his wife, a dental assistant, his three sons ages fifteen, eleven and eight, and his four-year-old daughter. He was a line inspector at the time of his participation in the corrupt scheme. He took $18,840 in illegal payoffs over a period beginning in the fall of 1989. He had extensive dealings with taxi operators, was instrumental in luring other inspectors into the scheme and aggressively solicited payoffs. He also purchased an illegal gun from one of his fellow inspectors.

Defendant is one of four children raised by his parents in a middle-class Brooklyn home. He dropped out of New Utrecht High School after completing the ninth grade. In 1979 he received his high school general equivalency diploma through the State University of New York. He attended St. John's University and completed twenty-one credits. He has a certificate in emissions equipment inspection programs from the New York City Department of Environmental Protection and another in dispensing and handling motor fuel from the New York City Fire Department.

In the Navy from 1974–1977, defendant received an other than honorable discharge with the rank of Seaman Apprentice. In the early 1980's defendant was employed as a film technician for a film laboratory and as a mechanic for a rental car company. From 1984–1986 he did not work due to a disability. From 1986–1989 he was a fleet mechanic for a cable company.

Work as a line inspector began in August 1989. He held that position until his arrest for this offense in July of 1992.

The relevant Guidelines call for 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. The government has not suggested a downward departure. The government characterizes his culpability as category five.

Because of his substantial role in the corruption scheme, Alfred Abbadessa is sentenced to 12 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $18,840, a fine of $5,000 and a special assessment of $50.

### 9. *Michael Antonucci*

 Michael Antonucci is forty-seven years old. He is married, and his only son is employed by the New York City Police Department. He is the brother of defendant Joseph Antonucci. Michael Antonucci was a line inspector while he participated in the corrupt scheme. He took $15,900 in illegal bribes over a period beginning in the fall of 1989. He had extensive dealings with taxi operators, was instrumental in luring other inspectors into the scheme and aggressively solicited payoffs.

Defendant was born in Brooklyn, New York, the youngest of three children raised by his parents in a middle-class home. He was born with nerve deafness in both ears that causes a slight speech impediment. He completed the eleventh grade at the High School of Communication Arts in Manhattan. He received his general equivalency diploma in 1990. He admits to a prior heroin addiction stemming back to the late 1960s. He took methadone treatment from 1971 to 1974, and has remained drug-free since then.

From 1963 to 1980, defendant worked as a skilled printer in the specialized area of fine printing. From 1981 to 1989, defendant held various jobs as an auto mechanic at auto repair shops. He also worked as a cable installer.

Work for the Commission began in August of 1989 as a line inspector. He resigned in October 1992 as a result of this prosecution.

The relevant Guidelines call for 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. The government has not suggested a downward departure. The government calls his culpability level five.

Because of his substantial role in the corruption scheme, Michael Antonucci is sentenced to 12 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $15,900, a fine of $5,000 and a special assessment of $50.

### 10. *Raymond Quinones*

 Raymond Quinones is twenty-six years old. He lives with a companion in an apartment in his parents' home. He is in the process of a divorce from his wife with whom he has a child he supports and visits regularly. Defendant was a line inspector at the time of his participation in the fraudulent scheme. He received $5,500 in illegal payoffs over a nineteen month period. Defendant collected money directly from representatives of the taxi industry both at the Woodside facility and at off-site garages. Other inspectors have reported that he failed taxis that should have passed inspection in order to generate additional payoffs. Defendant lied to the government about his involvement. Defendant either took cocaine while working as an inspector or received cocaine in lieu of cash payoffs.

Mr. Quinones was born in New York City, the eldest of two children. His father worked for General Motors. His mother works as the director of after-school programs at the Holy Family parochial school. His sister graduated from the Berkley Business School. The family lives in the Bronx. Defendant married in 1989 and has a four-year-old-son from that marriage. He has no children with his current companion.

Defendant graduated from Alfred E. Smith High School in the Bronx in 1986. He attended the Ohio Diesel School from 1986–1988, and received a certificate in diesel automotive technology. Defendant worked as a truck driver while he was attending school. After graduation he worked as a mechanic with an equipment leasing company and with Greyhound Bus Lines. He also worked as a bodyguard for a security company and as a tow truck operator for a towing company. He worked as a line inspector for the Commission from April 1990 until he resigned in October 1992 because of this case. Defen-

dant has since been employed as a tow truck operator..

Depending upon how the relevant Guidelines are construed, they call for either 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,-000, restitution and a $50 special assessment, *or* 6 to 12 months in prison, two to three years of supervised release, a fine of $2,000 to $20,000 and a $50 special assessment. The government has not suggested a downward departure. The government characterizes his culpability as level three.

Raymond Quinones is sentenced to 11 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $5,500, a fine of $5,000 and a special assessment of $50.

### 11. *Salvatore Cariola*

▉ Salvatore Cariola is thirty-four years old. He is married, but is separated from his wife and infant child and is in the process of a divorce. Defendant was a line inspector during his participation in the corrupt scheme. He took $16,950 in illegal payoffs over a thirty-six month period. He received money directly from taxi industry representatives and picked up money both on and off-site. He also received payoffs when he was the sole inspector working on a special lane that evaluated the under carriage of the taxi. Defendant either shared cocaine with co-workers or received cocaine as a payoff in lieu of cash.

Mr. Cariola was born in Cattania, Italy and immigrated to the United States in 1962 with his parents. He is a naturalized citizen. His father owns a barber shop and his family is middle-class. Defendant was married in April 1990 and separated from his wife only recently.

Defendant graduated from Grover Cleveland High School in Queens, New York. He completed a six-month course in general automotive mechanics at the Roberts Technical School. Defendant has been part-owner of an auto body shop, manager of a gas station, and part-owner of an auto repair shop. Defendant worked for the Commission as an inspector from 1987 until 1992 when he was dismissed following his arrest.

Defendant has reported a chronic substance abuse problem dating back to 1985. He disclosed to the Probation Department that in 1985 he began freebasing cocaine and smoking marijuana, spending between $150–200 a day on his habit. This habit continued until 1991 when the defendant voluntarily entered a drug treatment program. Defendant stated that after the treatment he was able to abstain from drugs for several months until he relapsed due to his arrest in this case. At the time of his pre-sentence interview he stated that he continues to use cocaine and marijuana, spending approximately $100 per day on his habit.

The relevant Guidelines call for 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. As a result of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as level three.

Salvatore Cariola is sentenced to 10 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $16,950, a fine of $5,000 and a special assessment of $50. It is recommended that while he is incarcerated he participate in a substance abuse program.

### 12. *Lawrence Lazewski*

▉ Lawrence Lazewski is twenty-seven years old. He is married and lives with his wife, his three-year-old son and fifteen-month-old daughter. Defendant was a line inspector during his participation in the fraudulent scheme. He received $13,000 in illegal payoffs over a twenty-five month period. He was one of only a few inspectors who accepted bribes for two years or more. By the conclusion of the investigation, the defendant was receiving between $250–500 a week in payoffs. He also received drugs in lieu of cash.

Defendant was born in Brooklyn and raised in Ozone Park, New York by both his parents. He has one brother. His mother works in the payroll office of a laundry and

---

his father works as a file clerk in a bank. Defendant married in 1989. He resides with his wife and children ages three and fifteen months with his wife's parents in Nassau County.

Defendant dropped out of high school in 1985 before graduating. He received his general equivalency diploma in January of 1988 through John Adams High School. From 1986 to 1988 he was employed with a window blind company as a delivery man and an installer. He then worked until 1989 as an auto mechanic in a gas station. In 1989 he began as a line inspector with the Commission, where he worked until November of 1992 when he was discharged because of this case.

Mr. Lazewski reports that he has had a problem with alcohol in the past. His wife stated in an interview with the Probation Department that he spent all of the fraudulently earned money on drink. The defendant admits to also having used both cocaine and marijuana. He claims that he has not used drugs for the last four years. Defendant states that he occasionally attended Alcoholics Anonymous meetings and sought help in 1991 through an Employee Assistance Program. He reports that he now only drinks occasionally. His urine tested negative for all drugs.

The relevant Guidelines call for 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. As a result of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as level three.

Lawrence Lazewski is sentenced to 10 months in prison where he should receive assistance with drug and alcohol abuse. This is to be followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $13,000, a fine of $5,000 and a special assessment of $50.

### 13. *Joseph Antonucci*

Joseph Antonucci is fifty-seven years old. He is married and has four grown children ages twenty-one to thirty. He lives with his wife, a bookkeeper, and his mother-in-law. He provides partial support for three of his children. He is the brother of defendant Michael Antonucci. Joseph Antonucci was a line inspector at the time he participated in the corrupt scheme. He received $18,540 in illegal payoffs over a period that began in January 1991. He was an active participant in the scheme, although not as active as his brother. He received money directly from industry representatives, and he failed, or threatened to fail, taxicabs when payments were not forthcoming.

The eldest of three children, defendant was raised in a middle-income home by both his parents in Brooklyn, New York. He graduated from East New York Vocational High School in Brooklyn in 1954. From 1963 to 1989, defendant worked in the printing industry as a lithographer for a firm that went bankrupt in 1989.

Defendant is hearing impaired and wears a hearing aid. He also suffers from chronic obstructive lung disease, and has had a polyp removed from his throat.

Work for the Commission began in April of 1990 as a line inspector. He worked in that position until July 1992. He was called back to work for the Department of Traffic in August of 1992. Defendant was injured while trying to prevent a tire from falling on him. He did not return to work. He was terminated because of this prosecution in October 1992.

The relevant Guidelines call for 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. As a result of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as level three.

Because of his role in the offense, along with all other relevant factors, Joseph Antonucci is sentenced to 9 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $18,540, a fine of $5,000 and a special assessment of $50.

### 14. *Ismael Hernandez*

■ Ismael Hernandez is thirty-four years old. He lives with his wife and two sons ages twelve years and sixteen months. Defendant was a line inspector at the time he participated in the fraudulent scheme. He took a total of $6,000 in illegal payoffs over the course of sixteen months. Defendant has been described by at least six other inspectors as an "active player" in the scheme. He collected payoffs directly from taxi industry representatives both at the Woodside facility and at off-site taxi garages. He failed taxis that should have passed inspection in order to elicit bribes.

Defendant was the third of four children born to a middle-class family. His parents were divorced when he was a child, and he was raised in the Bronx by his mother and her live-in companion. Defendant has been married since 1980 and both he and his wife describe their marriage as stable. They live with their two sons in the Bronx. Defendant's wife works part-time in a furniture store.

Mr. Hernandez attended Alfred E. Smith High School in the Bronx until he was discharged when he was over seventeen. He completed the ninth grade. Defendant informed the probation department that he graduated from high school in 1974. His records at the Commission include a photocopy of a general equivalency diploma. DOI investigators have established that the "GED" on file is a forgery. A high school diploma or a GED is required in order to become a taxi inspector.

Defendant has received a certificate in auto mechanics. He has held a number of jobs as an auto mechanic. Defendant was employed as a line inspector from April 1990 until he resigned in July 1992. He is now working as an ambulance driver.

The relevant Guidelines call for 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. The government has not suggested a downward departure. The government characterizes his culpability as level three.

Ismael Hernandez is sentenced to 9 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $6,000, a fine of $5,000 and a special assessment of $50.

### 15. *Gilbert O'Connor*

■ Gilbert O'Connor is forty-three years old. He lives with his wife, who works as a home attendant, his nineteen-year-old son, who is a college student, and his ten-month-old daughter. Defendant was a line inspector while he participated in the corrupt scheme. He took $2,976 in illegal payoffs over a thirteen month period beginning in July of 1991. He received payoffs directly from taxi industry representatives and also collected payoffs for other corrupt inspectors. He purchased an illegal gun from a taxi fleet manager. Defendant testified that after he made a complaint to a supervisor about the corruption, the paint on his car was scratched.

Defendant was born in Kingston, Jamaica. He has a brother and a sister. His parents separated when he was nine years old. Defendant's father immigrated to the United States in 1970, his sister in 1975 and his brother in 1978. Defendant was married in Jamaica in 1976 and immigrated with his wife and child in 1984 for economic reasons. He became a naturalized citizen in 1989.

He completed high school and two years of college in Jamaica. From 1978 to 1984 he worked as a revenue agent for the Jamaica Civil Service and Collector General Department. In the United States, defendant received a New York State general equivalency diploma from Jamaica High School. From 1985 to 1987 he worked as a security guard. From 1987 to 1990 he worked as a motor vehicle inspector for the State of New York and then for the City of New York.

Work as a line inspector began in September of 1990. In October of 1992 the defendant resigned from his position pursuant to his plea agreement.

The relevant Guidelines call for 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. In

light of his substantial assistance to the government, it has suggested a downward departure. The government deems his culpability as level three.

Because of his role in the offense, and his purchase of an illegal gun, together with all other relevant factors, Gilbert O'Connor is sentenced to 9 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the total amount of the bribes he received, $2,976, a fine of $5,000 and a special assessment of $50.

### 16. *Henry Muller*

 Henry Muller is forty-four years old. He lives with his wife and their two children ages one and four. He also provides support for two children, age eleven, from a previous marriage. Defendant was a line inspector during the time of his involvement in the fraudulent scheme. He received a total of $6,000 in illegal payoffs over a seventeen month period. Defendant dealt directly with representatives of the taxi industry, collecting payoffs both at the Woodside facility and at off-site garages. He also intentionally failed taxicabs in order to generate additional payoffs.

Defendant was one of five children in a lower-middle income family in Queens, New York. His father was a carpenter and his mother worked for the New York City Department of Welfare. Both of his parents have died. Defendant married his first wife in 1971. Together, they had twin boys. They were divorced in 1986. Defendant married again in 1988 to his current wife, a legal secretary.

Mr. Muller attended one year of high school at East New York Technical High School. From 1968 to 1970, he served in the United States Air Force, and he received an honorable discharge. He received a general equivalency diploma in 1972 in Pennsylvania. He served for seven years on the volunteer fire and ambulance corps in Pennsylvania. Defendant attended the Luzerne County Community College for one year in the late 1970's.

Defendant has worked in the service department of a car dealership, as a facility operations agent with the New York and New Jersey Port Authority and as the manager of the paint department in a home center store. He began working as a line inspector in June of 1989. He was temporarily suspended by the Commission because of this case in 1992, but was then transferred to a different division where he worked until he resigned in January 1993 pursuant to his plea agreement.

The relevant Guidelines call for 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. As a result of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as level three.

Henry Muller is sentenced to 8 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $6,000, a fine of $5,000 and a special assessment of $50.

### 17. *Juan Ayala*

 Juan Ayala is twenty-six years old. He lives with his wife and young child in an apartment in Manhattan. Defendant was a line inspector during his involvement in the fraudulent scheme. He took less than $1,000 in illegal payoffs over a one year period. Defendant was less active than most others in the scheme. He received money and auto parts directly from taxi industry representatives, but his dealings with them were not extensive. He has been described by other defendants in the case as a "yes man" who followed the lead of other inspectors. Defendant used cocaine that was received from taxi industry representatives.

Mr. Ayala was born the third of four children to a middle-class family in New York City. His father is a factory worker and his mother is a seamstress. Defendant married in October 1990. His daughter, now two years old, was born in 1992. Defendant's wife works as a teacher's aid at a Head Start program.

Defendant graduated with honors from Automotive High School in Brooklyn in 1986. He attended the Denver Automotive and

Diesel College, Inc., completed the course of Automotive Technician and graduated in 1987.

After graduation, he worked as an apprentice mechanic for a Manhattan car dealership, and then as a mechanic at a dealership in Queens. He worked as a line inspector for the Commission from September 1990 to July 1992 when he was terminated as a result of this case. Defendant has since been employed as a records clerk for the New York City Health and Hospitals Corporation at the North Central Bronx Hospital.

The relevant Guidelines call for 18 to 24 months in prison, two to three years of supervised release, a fine of $4,000 to $40,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government categorizes his culpability as level two.

Juan Ayala is sentenced to 7 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $1,000, a fine of $4,000 and a special assessment of $50.

### 18. *Anthony Tetro*

■ Anthony Tetro is thirty-two years old. He is single, has no children and lives with his parents in Long Island. Defendant worked as a line inspector during the time of his involvement in the fraudulent scheme. He received a total of $6,000 in illegal payoffs over a twelve month period. Defendant received money directly from taxi industry representatives. He participated in both corrupt line inspections and improper issuances of condition corrected receipts.

Defendant is one of ten children born to a middle class family. He grew up in Long Island, New York. His father worked for the Department of Sanitation as an incinerator operator and his mother was a homemaker. Defendant has always lived at home except for one year between 1991 and 1992. In 1987 he received an award for service from the Nassau County Police Department's Civilian Radio Motor Patrol.

Mr. Tetro graduated from Plainview High School in Long Island in 1979. He success-

fully completed a course in automobile mechanics at a vocational school in 1980. Defendant has worked as a mechanic in several service stations. He also worked as a mechanic for a cable television company, the United Postal Service, and for a messenger service. Defendant was employed as a taxi inspector from 1990 until he resigned in 1992 as a result of this case. Since his arrest in this case in 1992, he has been working as a mechanic at an auto service center.

The relevant Guidelines call for 24 to 30 months in prison, two to three years of supervised release, a fine of $5,000 to $50,000, restitution and a $50 special assessment. As a result of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as level three.

Anthony Tetro is sentenced to 7 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $6,000, a fine of $5,000 and a special assessment of $50.

### 19. *Peter DePrima*

■ Peter DePrima is thirty-four years old. He is single and has no children. He lives with and takes care of his mother who suffers from high blood pressure, ulcers and diabetes. Defendant was working as a line inspector while he participated in the corrupt scheme. He took $2,780 in illegal payoffs over a nine month period beginning in 1991. He was less active than most in the scheme. He did not solicit bribes but he did share in bribe money received by others.

Defendant was raised in Brooklyn, one of three children in a middle-class family. He graduated from Automotive High School in Brooklyn in 1978. Since high school defendant has worked as a mechanic in several service stations, as an elevator operator and as an assistant pressman for a paper company. He was unemployed from 1988 to 1989. He began working in August of 1989 as a line inspector. He held that position until March 1992.

The relevant Guidelines call for 18 to 24 months in prison, two to three years of supervised release, a fine of $4,000 to $40,000,

restitution, and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government lists this defendant's culpability as category two.

Peter DePrima is sentenced to 6 months in prison followed by two years of supervised release. Defendant is ordered to pay restitution to the City in the amount of the bribes he received, $2,780, a fine of $4,000 and a special assessment of $50.

### 20. Brian Ficeto

██ Brian Ficeto is twenty-five years old. He is single, he has no children and he lives at home with his parents. Defendant worked for the Commission as a line inspector during the time he participated in the fraudulent scheme. He received $4,350 in illegal payoffs over an eight month period. Defendant was primarily a messenger for other corrupt inspectors. He was often directed to pick up payoffs that had been left with the owner of a nearby coffee truck. He refused to pass taxicabs that had failed inspections.

Defendant was born in Brooklyn, New York. He has one younger brother. His father is a supervisor at a post office in Manhattan and his mother is the receptionist at a law firm. His brother is in high school.

Mr. Ficeto graduated from South Shore High School in Brooklyn, New York in 1986. He attended Kingsborough Community College for one semester. Defendant has been steadily employed since he left school. He has worked in supermarkets and gas stations and at an air conditioning service. He was employed as a plumber's helper from 1980 to 1989. From 1989 to 1990 he worked as a van driver delivering packages. In April 1990 he became a line inspector for the Commission. He resigned in 1992 because of his involvement with this case.

The relevant Guidelines call for 18 to 24 months in prison, two to three years of supervised release, a fine of $4,000 to $40,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government categorizes his culpability as level two.

Brian Ficeto is sentenced to 6 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $4,350, a fine of $4,000 and a special assessment of $50.

### 21. St. Elmo Moaze

██ St. Elmo Moaze is twenty-seven years old. He is single and has no children. He lives with his mother, stepfather and two half-siblings. Defendant was employed as a line inspector while he participated in the corrupt scheme. He took $5,025 in illegal payoffs over a twelve month period beginning in August 1991. He was less active than most in the scheme. He did not receive bribes directly from taxi industry representatives. He did share in money collected by other inspectors. He initially refused to accept payoffs but later acquiesced.

Defendant was born and raised in Barbados, West Indies by his mother and his aunt. The defendant's mother moved to the United States in 1972. Defendant joined her in 1976. He graduated from the Alexander Hamilton Vocational and Technical High School in Brooklyn in 1985. He spent one semester at the State University of New York at Farmingdale and two semesters at the New York Technical College where he majored in automotive technology. He completed a course in auto mechanics at the Berk Trade School in 1987. From 1988 to 1990 defendant worked as an auto mechanic at various service centers.

Work began in August of 1990 as a line inspector. He held that position until June of 1992. From 1992 to 1993 defendant worked as a mechanic for an auto repair shop. He is now employed as a compressor disassembler at a refrigeration company.

The relevant Guidelines call for 18 to 24 months in prison, two to three years of supervised release, a fine of $4,000 to $40,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government lists his culpability as category two.

St. Elmo Moaze is sentenced to 6 months in prison followed by two years of supervised

release. He is ordered to pay restitution to the City in the amount of the bribes he received, $5,025, a fine of $4,000 and a special assessment of $50.

### 22. *Joseph Ridley*

Joseph Ridley is twenty-six years old. He is single and he has no children. He is the sole support of his mother with whom he lives. He worked as a line inspector while he participated in the corrupt scheme. He took $3,250 in illegal payoffs over a sixteen month period beginning in March 1992. He was one of the less active participants in the scheme, generally sharing payoffs obtained by others rather than soliciting. He did fail taxis in order to obtain additional payoffs.

Defendant and his sister were raised by both parents in Staten Island. In 1984 the defendant's father died. His mother suffers from high blood pressure and a nervous condition. Defendant graduated from Tottenville High School in Staten Island in 1985. He is engaged, but this criminal proceeding has caused the postponement of plans for marriage.

He has worked as an apprentice at an air conditioning company, as a messenger and as a clerk for a brokerage house. He has completed a course in desktop publishing at the Printing Trades School in Manhattan. He began working for the Commission in 1989 as an assistant stock handler. He was later promoted to line inspector.

The relevant Guidelines call for 18 to 24 months in prison, two to three years of supervised release, a fine of $4,000 to $40,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as level two.

Joseph Ridley is sentenced to 6 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $3,250, a fine of $4,000 and a special assessment of $50.

### 23. *John Sarcone*

John Sarcone is twenty-nine years old. He is separated from his wife and has no children. Defendant worked as a line inspector while he participated in the corrupt scheme. He took $1,930 over a twelve month period beginning in August 1991. On several occasions he shared cocaine that was obtained from people in the taxi industry. He was a somewhat less active participant than most. He did share money collected by other inspectors and he caused taxis to fail inspection in order to obtain additional payoffs.

Defendant was born and raised in Staten Island by both his parents in a middle-class home. His father was a fireman and his mother was a homemaker. He graduated from Port Richmond High School in Staten Island in 1982. After high school the defendant owned a tow trucking business that he ran until 1990. In 1985 his father was diagnosed with Lou Gehrig's disease. Defendant actively cared for his father until his death in 1992. In 1989, his mother died of a heart attack.

Work began in January 1990 as a line inspector. He was suspended as a result of this prosecution. He is currently employed as a landscaper assistant and as a clerk in a supermarket.

The relevant Guidelines call for 18 to 24 months in prison, two to three years of supervised release, a fine of $4,000 to $40,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government categorizes his culpability as level two.

John Sarcone is sentenced to 6 months in prison followed by two years of supervised release. He is ordered to pay restitution to the City in the amount of the bribes he received, $1,930, a fine of $4,000 and a special assessment of $50.

### 24. *Andrew Fichera*

Andrew Fichera is forty-five years old. He lives with his wife and their two sons ages eight and sixteen. Defendant was a line inspector during his participation in the fraudulent scheme. He took $2,000 in illegal payoffs over a four month period. Although defendant participated in the scheme

for only a short time, he did intentionally fail taxicabs when bribe money was not paid.

Defendant was born in New York City, one of two children. He was raised by both his parents in Jackson Heights, New York. His father was a butcher for a supermarket and his mother was a public relations representative for a bank. Defendant and his wife were married in 1972. They now live in Jackson Heights. She is unemployed because of a serious illness. Defendant is also ill, suffering from high blood pressure and heart problems.

Mr. Fichera graduated from Thomas Edison Vocational School in Jamaica, New York in 1966. He thereafter attended the Voorhees Technical Institute in New York City. He served in the United States Army from 1969 until 1972 when he was honorably discharged. Defendant has worked as a foreman for a taxi service in Long Island City. He was employed as a taxi inspector from 1989 until July 1993 when he was discharged because of this offense. He is now employed in the service department of a car dealership.

The relevant Guidelines call for 18 to 24 months in prison, two to three years of supervised release, a fine of $4,000 to $40,000, restitution and a $50 special assessment. The government has not suggested a downward departure. Although they characterized the defendant as forthcoming, he was among the last of the defendants to be arrested, and consequently the information he provided did not lead to further arrests. The government characterizes his culpability as level two.

Andrew Fichera is sentenced to three years of probation and 500 hours of community service. As a condition of probation he is to serve six months in home confinement. Defendant is ordered to pay restitution to the City in the amount of the bribes he received, $2,000, as well as a fine of $4,000 and a special assessment of $50.

### 25. *Ralph Sands*

■ Ralph Sands is twenty-nine years old. He lives with his wife and new-born child. Defendant was a line inspector during the time of his involvement in the fraudulent scheme. He took $500 in illegal payoffs over a period of five months. He was a less active participant in the scheme than most of the other defendants and took bribes only during the latter part of the investigation. He did, however, circumvent the Commission procedure requiring that a meter receipt be printed at the time of the inspection and attached to the inspection report to verify that the taxicab was present during the inspection.

Defendant was born in Brooklyn, New York one of three children. His parents were divorced two years after his birth, and he was raised by his mother. He describes his family as having lower economic means. In 1989 he was married to his present wife, and almost one year ago they had a daughter. The defendant's wife works full-time in a hospital as a dietician and she also works part-time as a home care attendant.

Defendant attended Midwood High School through the eighth grade. He reports that he was forced to leave school so that he could work full-time to contribute income to his family. In 1988, defendant completed a six-month course at the Apex Technical School in general automotive mechanics. He received his general equivalency diploma in 1989.

Mr. Sands has worked as a factory worker, in the stock room in an automotive supply store and for various automotive repair shops as a mechanic. He has also worked as a mechanic for a tire store and for a car dealership. He was employed as a taxi inspector from July 1991 until July 1992 when he was discharged as a result of his involvement with this case. Defendant is currently employed a catering company as an assistant cook. Since his arrest, he has been volunteering in a soup kitchen for the homeless and has coached a youth basketball league.

The relevant Guidelines call for 18 to 24 months in prison, two to three years of supervised release, a fine of $4,000 to $40,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government categorizes his culpability as level two.

Ralph Sands is sentenced to 3 years probation. As a condition of probation he shall

serve 6 months in home confinement. He is ordered give 500 hours of community service and to pay restitution to the City in the amount of the bribes he received, $500, a fine of $4,000 and a special assessment of $50.

### 26. *Richard Litwinkowich*

■ Richard Litwinkowich is forty-six years old. He lives with his wife and two children ages twelve and sixteen. Defendant was a line inspector at the time of his involvement in the fraudulent scheme. He received $1,000 in illegal payoffs over a four month period. Defendant received payoffs that were offered to him from other inspectors, but he was not involved with soliciting them from taxi industry representatives.

Defendant was born in Brooklyn, New York. His father was an automobile mechanic and taught the defendant his trade. When his father had his legs amputated due to complications with diabetes, the defendant was his primary caretaker. His father died at the age of forty-seven, and his mother died at the age of forty-one from an epileptic seizure. Defendant married his now wife in 1973. She is a homemaker.

Defendant is a scout master affiliated with the Saint Thomas Church in Brooklyn, and he is active in the Saint Vincent Ferrer Church, also in Brooklyn, where he is a principal of the Sunday school program and an usher. Defendant has several medical problems causing loss of sight, muscle spasms and chronic headaches.

Defendant attended high school through the ninth grade. He left school to assume family responsibilities. In 1986, he obtained his general equivalency diploma from Sheepshead Bay High School. He has worked for a car service in Brooklyn as a mechanic at an auto body shop. He was employed as a taxi inspector from 1986 until December 1992 when he resigned pursuant to his plea agreement. He is currently looking for a job and has had to sell his house to support his family.

The relevant Guidelines call for 18 to 24 months in prison, two to three years of supervised release, a fine of $4,000 to $40,000, restitution and a $50 special assessment. The government has recommended a downward departure due to his substantial assistance. The government characterizes his culpability as level two.

Richard Litwinkowich is sentenced to three years of probation and 500 hours of community service. As a condition of probation he is to serve three months in a community treatment center, being permitted to leave for work. Defendant is ordered to pay restitution to the City in the amount of the bribes he received, $1,000, as well as a fine of $4,000 and a special assessment of $50.

### 27. *Edwin Mercado*

■ Edwin Mercado is forty-one years old. He lives with his wife, who is an x-ray technician, and his three children ages sixteen, twelve and six. Defendant worked as a line inspector while he participated in the corrupt scheme. He took $250 in illegal payoffs over a two month period beginning in May 1992. He was a peripheral participant. He resisted joining in the corruption and only participated in the payoff scheme on a few occasions.

Defendant was born in Puerto Rico, the oldest of three children. His family moved to the United States when he was two years old. He attended Charles Evans Hughes High School in Manhattan until 1967 and completed the 11th grade. He received his New York State general equivalency diploma in 1990. From 1969 to 1990 defendant worked as an auto mechanic.

Work began as a line inspector in September 1990. Defendant was fired in July 1992 as a result of this prosecution. Defendant is currently employed by a detective agency.

The relevant Guidelines call for 12 to 18 months in prison, two to three years of supervised release, a fine of $3,000 to $30,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as level one.

In view of his minimal role in the corruption scheme, Edwin Mercado is sentenced to three years of probation and 500 hours of community service. As a condition of probation he is to serve three months in a community treatment center, being permitted to

leave for work. Defendant is ordered to pay restitution to the City in the amount of the bribes he received, $250, as well as a fine of $3,000 and a special assessment of $50.

### 28. *Jacob Rockson*

 Jacob Rockson is forty-eight years old. He lives with his wife and one of his four sons. Defendant was a line inspector during his participation in the fraudulent scheme. He received a total of $400 of illegal payoffs over a one month period. He never assisted in passing a taxi that should have failed inspection. He reported a payoff to a supervisor he later learned was part of the scheme. He refused payoffs that were offered to him while he worked on the line. He received a share of payoffs from a senior inspector in $20 to $30 amounts.

Defendant was born in Anomabu, Ghana. His father was a carpenter and his mother was a homemaker. His mother died when he was twelve years old, and his father died in 1993. The defendant married in Ghana in 1972. He has four sons, ages twenty-seven, twenty-five, twenty-one and sixteen. The family immigrated to the United States in 1978. In 1985, the defendant became a naturalized citizen. His wife now works in a nursing home. Defendant is an elder in a Presbyterian church in New Jersey.

Defendant completed a four-year course in motor vehicle mechanics at the Takadori Polytechnic in Ghana in 1960. He received a bachelor's degree in public administration in 1984 from the Metropolitan Collegiate Institute in London, England. He has worked for nine years as a taxi driver. He began working as a taxi inspector in 1988. He resigned in 1992. Since February 1992, defendant has worked as a full-time licensed currency exchange dealer at a foreign exchange bureau in New Jersey.

The relevant Guidelines call for 12 to 18 months in prison, two to three years of supervised release, a fine of $3,000 to $30,000, restitution and a $50 special assessment. The government has not suggested a downward departure because, although the defendant was forthcoming, he was among the last defendants arrested and, therefore, could not assist the prosecutor. The government characterizes his culpability as level one.

Jacob Rockson is sentenced to three years of probation and 500 hours of community service. As a condition of probation he is to serve three months in home confinement. Defendant is ordered to pay restitution to the City in the amount of the bribes he received, $400, as well as a fine of $3,000 and a special assessment of $50.

### 29. *George Rodriguez*

 George Rodriguez is twenty-seven years old. He lives with his wife and infant daughter. Defendant was a line inspector during his involvement in the payoff scheme. He received $300 over a one month period beginning in June 1992. He was involved in the scheme for the shortest period of time of all thirty of the inspectors who were prosecuted.

Mr. Rodriguez was born in Brooklyn, New York. He has a younger sister. His father is the director of housekeeping of a nursing home. His mother is a seamstress. The defendant was married in 1989. His wife works as an office assistant.

Defendant graduated from George Westinghouse High School in Brooklyn, New York in 1984. He attended Queensborough Community College in Bayside for one semester. Defendant has worked as a shipping clerk for a retail computer company, a toll collector at the George Washington Bridge, a temporary mail carrier for the United States Post Office, and as a courier for an overnight delivery service. He began working at the Commission as a stock handler in 1989, and in 1990 was promoted to line inspector. He was terminated in 1992 as a result of this prosecution. Since that time he has worked as a bill collector for a furniture company and as a salesman for a snack food manufacturer.

The relevant Guidelines call for 12 to 18 months in prison, two to three years of supervised release, a fine of $3,000 to $30,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as level one.

George Rodriguez is sentenced to three years of probation and 500 hours of community service. As a condition of probation he is to serve three months in a community treatment center, being permitted to leave for work. Defendant is ordered to pay restitution to the City in the amount of the bribes he received, $300, as well as a fine of $3,000 and a special assessment of $50.

### 30. *Raphael Sargeant*

■ Raphael Sargeant is thirty-three years old. He is separated from his wife and has two children whom he supports. Defendant worked as a line inspector during his involvement in the fraudulent scheme. He received $600 in illegal payoffs over a one month period. The government describes him as a peripheral participant in the scheme.

Defendant was born in Puerto Rico in 1960. He was raised there and moved to the United States in 1978. His father, now deceased, worked as a dock worker. His mother is a homemaker now living in Queens, New York. Defendant has been married twice. His first marriage ended in 1986. He has a seven-year-old daughter from that marriage. He was married again in 1989, but has since separated from his second wife. He has a five-year-old son from his second marriage.

Mr. Sargeant graduated from high school in Panama in 1977. He studied mechanical engineering for one semester at the University of Panama. He then moved to the United States and served in the United States Army from 1980 to 1982. He was honorably discharged. In 1986, he became a naturalized citizen. In 1987, he was awarded a certificate in diesel mechanics from the Apex Technical School in Manhattan.

Defendant has worked as a mechanic for an auto repair shop and as a mechanic at a garage. He began working for the Commission as an inspector in August 1989 and remained there until he resigned pursuant to his plea agreement in this case in 1992. He now works repairing truck tires.

The relevant Guidelines call for 12 to 18 months in prison, two to three years of supervised release, a fine of $3,000 to $30,000, restitution and a $50 special assessment. Because of his substantial assistance to the government, it has suggested a downward departure. The government characterizes his culpability as level one.

Raphael Sargeant is sentenced to three years of probation and 500 hours of community service. As a condition of probation he is to serve three months in a community treatment center, being permitted to leave for work. Defendant is ordered to pay restitution to the City in the amount of the bribes he received, $600, as well as a fine of $3,000 and a special assessment of $50.

## IV. *SUMMARY OF SENTENCES*

| Name | Loss of Liberty | Supervised Release Or Probation | Restitution | Fine |
|---|---|---|---|---|
| DeRiggi | 36 months | 2 years | $10,000 | $7,500 |
| Komonski | 30 months | 2 years | $ 3,650 | $7,500 |
| Barone | 24 months | 2 years | $ 3,000 | $7,500 |
| Gurdyal | 18 months | 2 years | $12,560 | $6,000 |
| Chao | 15 months | 2 years | $ 9,250 | $6,000 |
| Kruczowy | 15 months | 2 years | $10,500 | $5,000 |
| Smith | 13 months | 2 years | $16,650 | $6,000 |
| Abbadessa | 12 months | 2 years | $18,840 | $5,000 |
| Antonucci, M. | 12 months | 2 years | $15,900 | $5,000 |
| Quinones | 11 months | 2 years | $ 5,500 | $5,000 |
| Cariola | 10 months | 2 years | $16,950 | $5,000 |
| Lazewski | 10 months | 2 years | $13,000 | $5,000 |
| Antonucci, J. | 9 months | 2 years | $18,540 | $5,000 |
| Hernandez | 9 months | 2 years | $ 6,000 | $5,000 |
| O'Connor | 9 months | 2 years | $ 2,976 | $5,000 |

| Name | Loss of Liberty | Supervised Release Or Probation | Restitution | Fine |
|------|-----------------|----------------------------------|-------------|------|
| Muller | 8 months | 2 years | $ 6,000 | $5,000 |
| Ayala | 7 months | 2 years | $ 1,000 | $4,000 |
| Tetro | 7 months | 2 years | $ 6,000 | $5,000 |
| DePrima | 6 months | 2 years | $ 2,780 | $4,000 |
| Ficeto | 6 months | 2 years | $ 4,350 | $4,000 |
| Moaze | 6 months | 2 years | $ 5,025 | $4,000 |
| Ridley | 6 months | 2 years | $ 3,250 | $4,000 |
| Sarcone | 6 months | 2 years | $ 1,930 | $4,000 |
| Fichera | 6 months | 3 years | $ 2,000 & 500 hrs community service | $4,000 |
| Sands | 6 months | 2 years | $ 500 & 500 hrs community service | $4,000 |
| Litwinkowich | 3 months | 3 years | $ 4,000 & 500 hrs community service | $3,000 |
| Mercado | 3 months | 3 years | $ 250 & 500 hrs community service | $3,000 |
| Rockson | 3 months | 3 years | $ 400 & 500 hrs community service | $3,000 |
| Rodriguez | 3 months | 3 years | $ 300 & 500 hrs community service | $3,000 |
| Sargeant | 3 months | 3 years | $ 600 & 500 hrs community service | $3,000 |

## V. CONCLUSION

For the reasons stated in this memorandum and orally on the record during allocutions and upon sentencing, and based upon the court's observations of defendants and upon all the files in these cases, sentences are imposed under the statutes and Guidelines and in the court's discretion.

SO ORDERED.